BULL, EXECUTOR, *v.* UNITED STATES.

No. 649. Argued April 9, 1935.—Decided April 29, 1935.

248

*Mr. Loring M. Black,* with whom *Mr. David A. Buck-ley, Jr.,* was on the brief, for petitioner.

250

*Mr. James W. Morris,* with whom *Solicitor General Reed, Assistant Attorney General Wideman,* and *Mr. J. Louis Monarch* were on the brief, for the United States.

Mr. Justice Roberts delivered the opinion of the Court.

Archibald H. Bull died February 13, 1920. He had been a member of a partnership engaged in the business of ship-brokers. The agreement of association provided that in the event a partner died the survivors should continue the business for one year subsequent to his death, and his estate should " receive the same interests, or participate in the losses to the same extent," as the deceased partner would, if living, " based on the usual method of ascertaining what the said profits or losses would be. . . . Or the estate of the deceased partner shall have the option of withdrawing his interest from the firm within thirty days after the probate of will . . . and all adjustments of profits or losses shall be made as of the date of such withdrawal." The estate's representative did not exercise the option to withdraw in thirty days, and the business was conducted until December 31, 1920 as contemplated by the agreement.

The enterprise required no capital and none was ever invested by the partners. Bull's share of profits from January 1, 1920, to the date of his death, February 13, 1920, was $24,124.20; he had no other accumulated profits

and no interest in any tangible property belonging to the firm. Profits accruing to the estate for the period from the decedent's death to the end of 1920 were $212,718.79; $200,117.90 being paid during the year, and $12,601.70 during the first two months of 1921.

The Court of Claims found:

" When filing an estate-tax return, the executor included the decedent's interest in the partnership at a value of $24,124.20, which represented the decedent's share of the earnings accrued to the date of death, whereas the Commissioner, in 1921, valued such interest at $235,202.99, and subjected such increased value to the payment of an estate tax, which was paid in June and August 1921. The last-mentioned amount was made up of the amount of $24,124.20 plus the amount of $212,718.79, hereinbefore mentioned. The estate tax on this increased amount was $41,517.45.[1]

"April 14, 1921, plaintiff filed an income-tax return for the period February 13, 1920, to December 31, 1920, for the estate of the decedent, which return did not include, as income, the amount of $200,117.09 received as the share of the profits earned by the partnership during the period for which the return was filed. The estate employed the cash receipts and disbursement method of accounting.

" Thereafter, in July 1925 the Commissioner determined that the sum of $200,117.09 received in 1920 should have been returned by the executor as income to the estate for the period February 13 to December 31, 1920, and notified plaintiff of a deficiency in income tax due from the estate for that period of $261,212.65, which was due in part to the inclusion of that amount as taxable income and in part to adjustments not here in contro-

---

[1] It will be noted there is an error in the figures set out in this finding, the total of the two smaller sums being $236,842.99, but the discrepancy is not material to any issue in the case.

versy. No deduction was allowed by the Commissioner from the amount of $200,117.09 on account of the value of the decedent's interest in the partnership at his death."

September 5, 1925, the executor appealed to the Board of Tax Appeals from the deficiency of income tax so determined. The Board sustained the Commissioner's action in including the item of $200,117.99 without any reduction on account of the value of the decedent's interest in the partnership at the date of death,[2] and determined a deficiency of $55,166.49, which, with interest of $7,510.95, was paid April 14, 1928.

July 11, 1928, the executor filed a claim for refund of this amount, setting forth that the $200,117.99, by reason of which the additional tax was assessed and paid, was corpus; that it was so originally determined by the Commissioner and the estate tax assessed thereon was paid by the executor; and that the subsequent assessment of an income tax against the estate for the receipt of the same sum was erroneous. The claim was rejected May 8, 1929. September 16, 1930, the executor brought suit in the Court of Claims, and in his petition, after setting forth the facts as he alleged them to be, prayed judgment in the alternative (1) for the principal sum of $62,677.44, the amount paid April 14, 1928, as a deficiency of income tax unlawfully assessed and collected, or (2) for the sum of $47,643.44 on the theory that if the sum of $200,117.99 was income for the year 1920 and taxable as such, the United States should have credited against the income tax attributable to the receipt of this sum the overpayment of estate tax resulting from including the amount in the taxable estate,—$34,035,[3] with interest thereon.

---

[2] 7 B. T. A. 993.

[3] As appears from the quoted finding, the Court of Claims found the overpayment was $41,517.45.

254

The Court of Claims held that the item was income and properly so taxed. With respect to the alternative relief sought it said: "We cannot consider whether the Commissioner correctly included the total amount received from the business in the net estate of the decedent subject to the estate tax for the reason that the suit was not timely instituted." Judgment went for the United States.[4] Because of the novelty and importance of the question presented we granted certiorari.[5]

1. We concur in the view of the Court of Claims that the amount received from the partnership as profits earned prior to Bull's death was income earned by him in his lifetime and taxable to him as such; and that it was also corpus of his estate and as such to be included in his gross estate for computation of estate tax. We also agree that the sums paid his estate as profits earned after his death were not corpus, but income received by his executor and to be reckoned in computing income tax for the years 1920 and 1921. Where the effect of the contract is that the deceased partner's estate shall leave his interest in the business and the surviving partners shall acquire it by payments to the estate, the transaction is a sale, and payments made to the estate are for the account of the survivors. It results that the surviving partners are taxable upon firm profits and the estate is not.[6] Here, however, the survivors have purchased nothing belonging to the decedent, who had made no investment in the business and owned no tangible property connected with it. The portion of the profits paid his estate was, therefore, income and not corpus; and this is so whether we consider the executor a member of the old firm for the remainder

---

[4] 79 Ct. Cls. 133; 6 F. Supp. 141.

[5] 294 U. S. 704.

[6] *Hill* v. *Commissioner*, 38 F. (2d) 165; *Pope* v. *Commissioner*, 39 F. (2d) 420.

of the year, or hold that the estate became a partner in a new association formed upon the decedent's demise.

2. A serious and difficult issue is raised by the claim that the same receipt has been made the basis of both income and estate tax, although the item cannot in the circumstances be both income and corpus; and that the alternative prayer of the petition required the court to render a judgment which would redress the illegality and injustice resulting from the erroneous inclusion of the sum in the gross estate for estate tax. The respondent presents two arguments in opposition, one addressed to the merits and the other to the bar of the statute of limitations.

On the merits it is insisted that the Government was entitled to both estate tax and income tax in virtue of the right conferred on the estate by the partnership agreement and the fruits of it. The position is that as the contract gave Bull a valuable right which passed to his estate at his death the Commissioner correctly included it for estate tax. And the propriety of treating the share of profits paid to the estate as income is said to be equally clear. The same sum of money in different aspects may be the basis of both forms of tax. An example is found in this estate. The decedent's share of profits accrued to the date of his death was $24,124.20. This was income to him in his lifetime and his executor was bound to return it as such. But the sum was paid to the executor by the surviving partners, and thus became an asset of the estate; accordingly the petitioner returned that amount as part of the gross estate for computation of estate tax and the Commissioner properly treated it as such.

We are told that since the right to profits is distinct from the profits actually collected we cannot now say more than that perhaps the Commissioner put too high a value on the contract right when he valued it as equal to the amount

of profits received—$212,718.99. This error, if error it was, the Government says is now beyond correction.

While, as we have said, the same sum may in different aspects be used for the computation of both an income and an estate tax, this fact will not here serve to justify the Commissioner's rulings. They were inconsistent. The identical money,—not a right to receive the amount, on the one hand, and actual receipt resulting from that right on the other,—was the basis of two assessments. The double taxation involved in this inconsistent treatment of that sum of money is made clear by the lower court's finding we have quoted. The Commissioner assessed estate tax on the total obtained by adding $24,124.20, the decedent's share of profits earned prior to his death, and $212,718.79, the estate's share of profits earned thereafter. He treated the two items as of like quality, considered them both as capital or corpus; and viewed neither as the measure of value of a right passing from the decedent at death. No other conclusion may be drawn from the finding of the Court of Claims.

In the light of the facts it would not have been permissible to place a value of $212,718.99 or any other value on the mere right of continuance of the partnership relation enuring to Bull's estate. Had he lived, his share of profits would have been income. By the terms of the agreement his estate was to sustain precisely the same status *quoad* the firm as he had, in respect of profits and losses. Since the partners contributed no capital and owned no tangible property connected with the business, there is no justification for characterizing the right of a living partner to his share of earnings as part of his capital; and if the right was not capital to him, it could not be such to his estate. Let us suppose Bull had, while living, assigned his interest in the firm, with his partners' consent, to a third person for a valuable consideration, and in making return of income had valued or capitalized the right to profits which

he had thus sold, had deducted such valuation from the consideration received, and returned the difference only as gain. We think the Commissioner would rightly have insisted that the entire amount received was income.

Since the firm was a personal service concern and no tangible property was involved in its transactions, if it had not been for the terms of the agreement, no accounting would have ever been made upon Bull's death for anything other than his share of profits accrued to the date of his death,—$24,124.20,—and this would have been the only amount to be included in his estate in connection with his membership in the firm. As respects the status after death the form of the stipulation is significant. The declaration is that the surviving partners " are to be at liberty " to continue the business for a year, in the same relation with the deceased partner's estate as if it were in fact the decedent himself still alive and a member of the firm. His personal representative is given a veto which will prevent the continuance of the firm's business. The purpose may well have been to protect the good will of the enterprise in the interest of the survivors and to afford them a reasonable time in which to arrange for their future activities. But no sale of the decedent's interest or share in the good will can be spelled out. Indeed the Government strenuously asserted, in supporting the treatment of the payments to the estate as income, that the estate sold nothing to the surviving partners; and we agree. An analogous situation would be presented if Bull had not died, but the partnership had terminated by limitation on February 13, 1920, and the agreement had provided that, if Bull's partners so desired, the relation should continue for another year. It could not successfully be contended that, in such case, Bull's share of profit for the additional year was capital.

We think there was no estate tax due in respect of the $212,718.79 paid to the executor as profits for the period subsequent to the decedent's death.

The Government's second point is that if the use of profits accruing to the estate in computing estate tax was wrong, the statute of limitations bars correction of the error in the present action. So the Court of Claims thought. We hold otherwise.

The petitioner included in his estate tax return, as the value of Bull's interest in the partnership, only $24,124.20, the profit accrued prior to his death. The Commissioner added $212,718.79, the sum received as profits after Bull's death, and determined the total represented the value of the interest. The petitioner acquiesced and paid the tax assessed in full in August, 1921. He had no reason to assume the Commissioner would adjudge the $212,718.79 income and taxable as such. Nor was this done until July, 1925. The petitioner thereupon asserted, as we think correctly, that the item could not be both corpus and income of the estate. The Commissioner apparently held a contrary view. The petitioner appealed to the Board of Tax Appeals from the proposed deficiency of income tax. His appeal was dismissed April 9, 1928. It was then too late to file a claim for refund of overpayment of estate tax due to the error of inclusion in the estate of its share of firm profits.[7] Inability to obtain a refund or credit, or to sue the United States, did not, however, alter the fact that if the Government should insist on payment of the full deficiency of income tax, it would be in possession of some $41,000 in excess of the sum to which it was justly entitled. Payment was demanded. The petitioner paid April 14, 1928, and on June 11, 1928, presented a claim for refund, in which he still insisted the amount in question was corpus, had been so determined and estate tax paid on that basis, and should not be classified for taxation as income. The claim was rejected May 8, 1929, and the present action instituted September 16, 1930.

[7] Revenue Act of 1924, §§ 1012 and 281, 43 Stat. pp. 342 and 301; Revenue Act of 1926, §§ 1112 and 319, 44 Stat. pp. 115 and 84.

The fact that the petitioner relied on the Commissioner's assessment for estate tax, and believed the inconsistent claim of deficiency of income tax was of no force, cannot avail to toll the statute of limitations, which forbade the bringing of any action in 1930 for refund of the estate tax payments made in 1921. As the income tax was properly collected, suit for the recovery of any part of the amount paid on that account was futile. Upon what theory, then, may the petitioner obtain redress in the present action for the unlawful retention of the money of the estate? Before an answer can be given the system of enforcing the Government's claims for taxes must be considered in its relation to the problem.

A tax is an exaction by the sovereign, and necessarily the sovereign has an enforcible claim against every one within the taxable class for the amount lawfully due from him. The statute prescribes the rule of taxation. Some machinery must be provided for applying the rule to the facts in each taxpayer's case, in order to ascertain the amount due. The chosen instrumentality for the purpose is an administrative agency whose action is called an assessment. The assessment may be a valuation of property subject to taxation which valuation is to be multiplied by the statutory rate to ascertain the amount of tax. Or it may include the calculation and fix the amount of tax payable, and assessments of federal estate and income taxes are of this type. Once the tax is assessed the taxpayer will owe the sovereign the amount when the date fixed by law for payment arrives. Default in meeting the obligation calls for some procedure whereby payment can be enforced. The statute might remit the Government to an action at law wherein the taxpayer could offer such defense as he had. A judgment against him might be collected by the levy of an execution. But taxes are the life-blood of government, and their prompt and certain availability an imperious need. Time out of mind, therefore, the sovereign has resorted to more drastic

means of collection. The assessment is given the force of a judgment, and if the amount assessed is not paid when due, administrative officials may seize the debtor's property to satisfy the debt.

In recognition of the fact that erroneous determinations and assessments will inevitably occur, the statutes, in a spirit of fairness, invariably afford the taxpayer an opportunity at some stage to have mistakes rectified. Often an administrative hearing is afforded before the assessment becomes final; or administrative machinery is provided whereby an erroneous collection may be refunded; in some instances both administrative relief and redress by an action against the sovereign in one of its courts are permitted methods of restitution of excessive or illegal exaction. Thus the usual procedure for the recovery of debts is reversed in the field of taxation. Payment precedes defense, and the burden of proof, normally on the claimant, is shifted to the taxpayer. The assessment supersedes the pleading, proof and judgment necessary in an action at law, and has the force of such a judgment. The ordinary defendant stands in judgment only after a hearing. The taxpayer often is afforded his hearing after judgment and after payment, and his only redress for unjust administrative action is the right to claim restitution. But these reversals of the normal process of collecting a claim cannot obscure the fact that after all what is being accomplished is the recovery of a just debt owed the sovereign. If that which the sovereign retains was unjustly taken in violation of its own statute, the withholding is wrongful. Restitution is owed the taxpayer. Nevertheless he may be without a remedy. But we think this is not true here.

In a proceeding for the collection of estate tax, the United States through a palpable mistake took more than it was entitled to. Retention of the money was against morality and conscience. But claim for refund or credit

was not presented or action instituted for restitution within the period fixed by the statute of limitations. If nothing further had occurred Congressional action would have been the sole avenue of redress.

In July, 1925, the Government brought a new proceeding arising out of the same transaction involved in the earlier proceeding. This time, however, its claim was for income tax. The taxpayer opposed payment in full, by demanding recoupment of the amount mistakenly collected as estate tax and wrongfully retained. Had the Government instituted an action at law, the defense would have been good. The United States, we have held, cannot, as against the claim of an innocent party, hold his money which has gone into its treasury by means of the fraud of its agent. *United States* v. *State Bank,* 96 U. S. 30. While here the money was taken through mistake without any element of fraud, the unjust retention is immoral and amounts in law to a fraud on the taxpayer's rights. What was said in the *State Bank* case applies with equal force to this situation. "An action will lie whenever the defendant has received money which is the property of the plaintiff, and which the defendant is obliged by natural justice and equity to refund. The form of the indebtedness or the mode in which it was incurred is immaterial. . . . In these cases, [cited in the opinion] and many others that might be cited, the rules of law applicable to individuals were applied to the United States" (pp. 35, 36).[8] A claim for recovery of money so held may not only be the subject of a suit in the Court of Claims, as shown by the authority referred to, but may be used by way of recoupment and credit in an action by the United States arising out of the same transaction. *United States* v. *Macdaniel,* 7 Pet. 1, 16, 17; *United States* v. *Ringgold,* 8 Pet. 150, 163–164. In the

---

[8] See also *McKnight* v. *United States,* 98 U. S. 179, 186.

latter case this language was used: "No direct suit can be maintained against the United States; but when an action is brought by the United States, to recover money in the hands of a party, who has a legal claim against them, it would be a very rigid principle, to deny to him the right of setting up such claim in a court of justice, and turn him round to an application to congress. If the right of the party is fixed by the existing law, there can be no necessity for an application to congress, except for the purpose of remedy. And no such necessity can exist, when this right can properly be set up by way of defence, to a suit by the United States." [9] If the claim for income tax deficiency had been the subject of a suit, any counter demand for recoupment of the overpayment of estate tax could have been asserted by way of defense and credit obtained notwithstanding the statute of limitations had barred an independent suit against the Government therefor. This is because recoupment is in the nature of a defense arising out of some feature of the transaction upon which the plaintiff's action is grounded. Such a defense is never barred by the statute of limitations so long as the main action itself is timely.[10]

The circumstance that both claims, the one for estate tax and the other for income tax, were prosecuted to judgment and execution in summary form does not obscure the fact that in substance the proceedings were actions to collect debts alleged to be due the United States. It is

---

[9] See also *The Siren*, 7 Wall. 152, 154.

[10] *Williams* v. *Neely*, 134 Fed. 1; *Conner* v. *Smith*, 88 Ala. 300; 7 So. 150; *Stewart* v. *Simon*, 111 Ark. 358; 163 S. W. 1135; *Beecher* v. *Baldwin*, 55 Conn. 419; *Blackshear* v. *Dekle*, 120 Ga. 766; 48 S. E. 311; *Aultman & Co.* v. *Torrey*, 55 Minn. 492; 57 N. W. 211; *Kaup* v. *Schinstock*, 88 Neb. 95; 129 N. W. 184; *Campbell* v. *Hughes*, 73 Hun (N. Y.) 14; 25 N. Y. S. 1021.

immaterial that in the second case, owing to the summary nature of the remedy, the taxpayer was required to pay the tax and afterwards seek refundment. This procedural requirement does not obliterate his substantial right to rely on his cross-demand for credit of the amount which if the United States had sued him for income tax he could have recouped against his liability on that score.

To the objection that the sovereign is not liable to respond to the petitioner the answer is that it has given him a right of credit or refund, which though he could not assert it in an action brought by him in 1930, had accrued and was available to him since it was actionable and not barred in 1925 when the Government proceeded against him for the collection of income tax.

The pleading was sufficient to put in issue the right to recoupment. The Court of Claims is not bound by any special rules of pleading; [11] all that is required is that the petition shall contain a plain and concise statement of the facts relied on and give the United States reasonable notice of the matters it is called upon to meet.[12] And a prayer for alternative relief, based upon the facts set out in the petition may be the basis of the judgment rendered.[13]

We are of opinion that the petitioner was entitled to have credited against the deficiency of income tax, the amount of his overpayment of estate tax with interest and that he should have been given judgment accordingly. The judgment must be reversed and the cause remanded for further proceedings in conformity with this opinion.

*Reversed.*

[11] *United States* v. *Burns,* 12 Wall. 246, 254; *District of Columbia* v. *Barnes,* 197 U. S. 146, 153–154.

[12] *Merritt* v. *United States,* 267 U. S. 338, 341.

[13] *United States* v. *Behan,* 110 U. S. 338, 347.